**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division**

| | | |
|---|---|---|
| **NICHOLAS PETERSON et al.** | * | |
| *On behalf of themselves and others similarly situated,* | * | |
| | * | |
| **Plaintiffs,** | | **CIVIL NO.: JKB-16-3629** |
| | * | |
| **v.** | | |
| | * | |
| **M.J.J. INC. et al.,** | | |
| | * | |
| **Defendants.** | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

---

Melanie L. Glickson, Esq.
Federal Bar No. 28484
GLICKSON LAW FIRM, LLC
6 Reservoir Circle, Suite 201
Pikesville, Maryland 21208
Tel. 443.550.1298
Fax: 443.638.0080
*Attorney for Defendants*

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 2

II.     FACTUAL BACKGROUND/STATEMENT OF UNDISPUTED MATERIAL
        FACTS………… ...............................................................................................3

        A.      Background ........................................................................................... 3

        B.      Defendants' Communications Concerning the Tip Credit ................... 5

        C.      Plaintiffs' Payroll Records ................................................................... 6

        D.      Customer "Walkouts" ......................................................................... 7

        E.      Danson's and Peterson's Inmate Status .............................................. 7

III.    STANDARDS OF REVIEW ............................................................................. 9

        A.      Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) ....................... 9

        B.      Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ...................... 10

        C.      Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 ........ 11

IV.     ARGUMENT ....................................................................................................12

        A.      Suburban House Was Entitled to Take the Tip Credit; The Allegations
                that Defendants Failed to Inform Plaintiffs of the FLSA's Tip Credit
                Provisions Are Baseless. ...................................................................... 13

        B.      There is No Evidence to Support Plaintiffs' "Alternative" Allegations,
                Unrelated to the Tip Credit, That They Were Denied Minimum Wage
                and Overtime .......................................................................................... 16

                1.      The minimum wage and overtime claims in the First Amended
                        Complaint fail to meet the plausibility standards set forth in Iqbal
                        and Twombly ................................................................................. 16

                2.      Plaintiffs' earnings met, and typically exceeded, the minimum wage
                        and overtime thresholds ............................................................... 19

                3.      Plaintiffs' earnings met, and typically exceeded, the minimum wage
                        and overtime thresholds ............................................................... 19

        C.      There Is No Merit to Any Claim for Unlawful Wage Deductions Based
                on Business Losses ................................................................................ 21

        D.      Records Reflect that Danson Received Her Final Wages ................... 21

        E.      Danson and Peterson Are Not "Employees" Under the FLSA .......... 22

        F.      Danson and Peterson Are Unsuitable Class Representatives Based On
                Their Inmate Status .............................................................................. 25

IV.     CONCLUSION ................................................................................................25

The defendants M.J.J. Inc. ("Suburban House") and Mark Horowitz ("Horowitz") (collectively, Suburban House and Horowitz may sometimes hereinafter be collectively referred to as "Defendants"), by and through the undersigned counsel, hereby submit their memorandum of law in support of their motion to dismiss or, in the alternative, for summary judgment pursuant to Federal Rules of Civil Procedure 12 and 56.

## I.      INTRODUCTION

Plaintiffs filed a First Amended Complaint and added a third named plaintiff, Cali Fitzgerald, who was not an inmate on Work Release.  The First Amended Complaint should be dismissed or, in the alternative, summary judgment should be granted to Defendants.

There is no support for any of the allegations in the First Amended Complaint.  Allowing this matter to proceed any further invites a fishing expedition conducted by Plaintiffs at Defendants' expense.

Suburban House still maintains that Danson and Peterson are not "employees" under the FLSA because they were inmates on Work Release for much of their time at Suburban House.  Moreover, based on their inmate status, they were not similarly situated to traditional employees for myriad reasons; for example, they were not allowed to carry cash tips out of the restaurant.

The Court, however, need not decide the issue of whether inmates on Work Release are "employees" under federal and state wage laws, because the First Amended Complaint fails for myriad other reasons.  First, Plaintiffs' wage records for the three (3) year period prior to the filing

of the Complaint reflect that they were indeed paid correctly.[1]   Second, there is no evidence that

Defendants failed to comply with the FLSA's notification requirements concerning the tip credit.

Third, there is no basis for any class or collective action claim for wage deductions based on

"business losses."

The claims in the First Amended Complaint are baseless and the Court should not permit

this suit to proceed.

## II.   FACTUAL BACKGROUND/STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   <u>Background</u>

Defendant Mark Horowitz is the owner of Defendant M.J.J. Inc., doing business as

Suburban House, which is a restaurant located at 1700 Reisterstown Road, Ste 105, Pikesville,

Maryland, 21208.   Defendant Horowitz has been in the restaurant business for thirty-six (36)

years.  Suburban House is approximately seventy (70) years old.  Defendant Horowitz has owned

Suburban House for approximately thirty-four (34) years.   Currently, Suburban House has

approximately twenty-three (23) employees.  Declaration of Mark Horowitz ("Horowitz Decl."),[2]

at ¶¶ 1-2.

Plaintiff Danson worked for Suburban House from January 2015 to May 9, 2015.  *Exh. 1*

(Horowitz Decl.), *Exh. 1* (Payroll records); Independent Accountant's Report ("Accountant's

Report").[3]  During that period, Plaintiff Danson was an inmate participant in the Baltimore County

---

[1] There was a single error discovered in the amount of $30.32, which Suburban House promptly remedied the same day it learned of the error.
[2] Attached hereto as *Exh. 1* is a true and correct copy of the Declaration of Mark Horowitz ("Horowitz Decl.").
[3] Attached hereto as *Exh. 2* is a true and correct copy of the Independent Accountant's Report ("Accountant's Report").

Work Release Program working for Suburban House from January 12, 2015 to April 3, 2015.  First Amended Compl., at ¶ 11.

Plaintiff Peterson worked for Suburban House from late October 2015 to May 9, 2015. *Exh. 1* (Horowitz Decl.), at ¶ 6, *Exh. 1* (Payroll Records); *Exh.2* (Accountant's Report).  During that period, Plaintiff Peterson was an inmate participant in the Baltimore County Work Release Program working for Suburban House from October 29, 2014 to December 9, 2014.  First Amended Compl., ¶ 12; Doc. No. 21-1 (Pokorny Decl.), at ¶ 3.

Danson and Peterson were dating while they worked at Suburban House.  As soon as Danson was released from prison, she came to work showing symptoms that she was using drugs. Suburban House terminated Danson for this reason.  On the day Danson was terminated, Peterson became enraged and Suburban House terminated Peterson's employment the same day based on his inappropriate conduct.  *Exh. 1* (Horowitz Decl.), at ¶ 9.

Danson's last day of work was May 9, 2015 and she was paid her final wages by check dated May 15, 2015.  *Exh. 1* (Horowitz Decl.), *Exh. 1* (Payroll Records), p. 4.

Plaintiff Fitzgerald worked for Suburban House for a brief period early May 2015; then from mid July 2015 to early October 2015.   *Exh. 1* (Horowitz Decl.), *Exh. 1* (Payroll records); *Exh.2* (Accountant's Report).  Fitzgerald was terminated because she came to work showing signs of being extremely high on drugs.  *See Exh. 1* (Horowitz Decl.), at ¶ 10.  Fitzgerald was so high that she would pour soup all over herself.  Declaration of Betty Bopst ("Bopst Decl."), at ¶ 5.[4] Other employees complained that they could not work with her.  At one point, Defendant Horowitz told Fitzgerald that she should not come back to work until she was clean.  Suburban House

---

[4] Attached hereto as *Exh. 3* is a true and correct copy of the Declaration of Betty Bopst ("Bopst Decl.").

terminated Fitzgerald because she came to work high on drugs, and was seen by three (3) employees smoking methamphetamine or crack from a homemade pipe in the fenced-in dumpster area behind the restaurant.  *Exh. 1* (Horowitz Decl.), at ¶ 10; *Exh. 3* (Bopst Decl.) at ¶ 5; Declaration of Ricky Tyson ("Tyson Decl."),[5] at ¶ 5.

### B.      Defendants' Communications Concerning the Tip Credit

Throughout the relevant time period, when a tipped employee is hired, Defendant Horowitz sits down with each new hire and explains that he or she will be paid $3.63/hour (or the corresponding relevant amount in prior years), plus tips.  Horowitz explains that the employee will be able to earn and keep all tips which is why the rate is so low.  Horowitz does not use the phrase "tip credit" in this conversation, but he does explain that the reason why the hourly rate is so low is because the tips will make up for the low rate.  Horowitz explains this to all employees and did so to Danson, Peterson and Fitzgerald at the time of hire.  *Exh. 1* (Horowitz Decl.), at ¶ 7; Declaration of Holly Morgan ("Morgan Decl")[6], at ¶ 2.

Since Suburban House is a busy restaurant, there is no scarcity of tips to meet the minimum wage requirements.  In most instances, employees receive more than the amounts they are required to receive based on the minimum wage and/or overtime requirements.  *Exh. 1* (Horowitz Decl.), at ¶ 7; *Exh. 5* (Morgan Decl.), at ¶ 2.

Suburban House posts employment-related posters in and around the kitchen area.  For example, a Poster entitled "Maryland Minimum Wage and Overtime Law" has been posted for

---

[5] Attached hereto as *Exh. 4* is a true and correct copy of the Declaration of Ricky Tyson ("Tyson Decl.").

[6] Attached hereto as *Exh. 5* is a true and correct copy of the Declaration of Holly Morgan ("Morgan Decl.").

years on the loading dock door.  This Poster provides the Maryland Minimum Wage Rate in effect

on different dates ($7.25 Until 12/31/14; $8.00 Effective 1/1/15; $8.25 Effective 7/1/15; $8.75

Effective 7/1/15; $8.75 Effective 7/1/16, etc.).  The Poster also states, in relevant part,

> **Tipped Employees** (earning more than $30 per month in tips): must earn the State Minimum Wage Rate per hour.  Employees must pay at least **$3.63** per hour.  This amount plus tips must equal at least the State Minimum Wage Rate.

(Emphasis in original).  *Exh. 1* (Horowitz Decl.), at ¶ 8; *Exh. 3* (Bopst Decl.) at ¶ 2; *Exh. 4*

(Tyson Decl.), at ¶ 5; *Exh. 5* (Morgan Decl.), at ¶ 5.

Suburban House also has a Poster entitled "Federal Labor Laws" posted on the front

kitchen door.  That Poster states, in relevant part:

> TIP CREDIT.  Employers of "tipped employees" who meet certain conditions may claim a partial wage credit based on tips received by their employees.  Employees must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation.  If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference.

*Exh. 1* (Horowitz Decl.), at ¶ 8; *Exh. 3* (Bopst Decl.) at ¶ 2; *Exh. 4* (Tyson Decl.), at ¶ 5;

*Exh. 5* (Morgan Decl.), at ¶ 5.

### C.      Plaintiffs' Payroll Records

Neither Danson, Peterson, nor Fitzgerald worked any overtime in the three (3) year prior

to the date the Initial Complaint was filed.  *Exh. 2* (Accountant's Report); *Exh. 1* (Horowitz Decl.),

*Exh. 1* (Payroll records).

Suburban House obtained from Paychex, its payroll company, all payroll records for the

three (3) named plaintiffs for the three (3) year period prior to the filing of the Initial Complaint.

*Exh. 1* (Horowitz Decl.), at ¶ 6; *Exh. 1* (Horowitz Decl.), *Exh. 1* (Payroll records).  These records

6

were turned over to an independent accountant with particular experience in the hospitality industry. *Id*., https://www.cohnreznick.com/industries/hospitality. The independent accountant summarized the payroll records for Peterson, Danson and Fitzgerald in a report, and examined whether there were any minimum wage or overtime violations. *Exh. 2* (Accountant's Report).

There was one (1) mistake, in that Peterson should have received an extra $30.32 on 11/14/15.[7] *Id*. Otherwise, there were no minimum wage or overtime violations found. *Id*.

### D.    Customer "Walkouts"

During the relevant time period, Suburban House told servers that they would be responsible if customers walked out of the restaurant without paying the check. This policy was rarely enforced. Neither Danson, Peterson, nor Fitzgerald were ever required to pay for customer walkouts. *Exh. 3* (Bopst Decl.), at ¶ 4.

Customers almost never walk out of Suburban House without paying the tab. When this does occur, it is usually because they forgot, and pay the bill a short while later. Over the past three (3) years, Suburban House enforced this policy approximately one (1) time. Suburban House no longer advises staff that they are responsible for reimbursing customer walkouts. There were no other policies requiring employees to pay for business losses. *See Exh. 1* (Horowitz Decl.), at ¶ 11; *Exh. 3* (Bopst Decl.), at ¶ 4; *Exh. 4* (Tyson Decl.), at ¶ 3; *Exh. 5* (Morgan Decl.), at ¶ 4.

### E.    Danson's and Peterson's Inmate Status

An inmate sentenced to the Baltimore County Department of Corrections may participate in the Work Release Program if s/he is recommended by the sentencing judge and meets certain

---

[7] As soon as this error was discovered, Suburban House wrote a check to Peterson for $30.32. *Exh. 1* (Horowitz Decl.), *Exh. 4*.

eligibility criteria.  Declaration of Philip Pokorny ("Pokorny Decl."),[8] at ¶ 2; MD. CORRECTIONAL SERVICES CODE ANN. § 11-602.

The Program offers eligible inmates the opportunity to work while incarcerated, allowing financial support to be provided to his/her family.  *Id.*, at ¶ 2.    The purpose behind the Program is to provide meaningful work experiences for inmates that are intended to allow inmates to improve work habits, attitudes, and skills to improve the employability of the inmates on release.  1999 Md. ALS 54, 1999 Md. Laws 54, 1999 Md. Chap. 54, 1999 Md. HB 11.

Inmates in the Program leave the prison to go to work, and return to prison when their shift is complete.  *Exh. 6*, at ¶ 2; MD. CORRECTIONAL SERVICES CODE ANN. § 11-603.  Inmates in the Program are not permitted to drive themselves to work.  They typically take mass transit to and from their place of work.  *Id.*, at ¶ 2.  Employers who employ inmates through the Program pay the inmate directly.  *Id.*, at ¶ 3. The inmate is required to turn in his or her paycheck to the Department, and the paycheck is then deposited into the inmate's account.  Program fees are deducted and the balance is available to the inmate.  *Id.*, at ¶ 3.

The Department remains involved with the inmate and the employer for the duration of the inmate's work.  *Id.*, at ¶ 4.   For example, the Department conducts regular on-site visits at the work site and telephone checks with the employer to check in on the inmate.  The Department also conducts random drug tests of inmates to monitor the use of alcohol and/or narcotics.  *Exh. 6,* at ¶ 4. Work Release inmates may not be left unsupervised on the job.  *Id.*, at ¶ 5.  While working, inmates may not make or receive telephone calls, have visits with friends or relatives, make unauthorized purchases, leave the job site (even for lunch) without Department approval, be sent

---

[8] Attached hereto as *Exh. 6* is a true and correct copy of the Declaration of Philip Pokorny ("Pokorny Decl.").

to another location without Department notification, or conduct personal business.  *Id.*, at ¶ 5.

Inmates on Work Release may not take their cash tips with them out of the restaurant.  *Exh. 1* (Horowitz Decl.), at ¶ 4.

## III.   STANDARDS OF REVIEW

### A.   <u>Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1)</u>

With regard to a motion to dismiss for lack of subject matter jurisdiction, this Court has explained that:

> A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction may be founded on either of two bases. As with a motion to dismiss under Rule 12(b)(6), a Rule 12(b)(1) motion to dismiss may challenge subject matter jurisdiction by demonstrating that the complaint "fails to allege facts upon which subject matter jurisdiction can be based." . . . In the alternative, a Rule 12(b)(1) motion may assert a lack of subject matter jurisdiction "in fact" apart from any pleading. *See id*. In such cases, a court may look beyond the allegations in the complaint to determine whether any evidence supports the exercise of jurisdiction.

*Russell v. Cont'l Rest., Inc.,* 430 F. Supp. 2d 521, 523 (D. Md. 2006) (*quoting Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir. 1982)); *see also Sharafeldin v. Maryland Dept. of Public Safety & Correctional Services*, 94 F. Supp. 2d 680, 684-85 (D. Md. 2000) (when a defendant challenges subject matter jurisdiction on a motion to dismiss, the court may consider evidence outside the pleadings without converting the motion to a motion for summary judgment).

This Court has further held that "[w]hether the defendant attacks jurisdiction under the former or latter theory, once the issue of subject matter jurisdiction has been raised, the plaintiff bears the burden of proving that subject matter jurisdiction exists in the federal courts."  *Russell*, 430 F. Supp. 2d at 523; *see also Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). " '[T]he court may look beyond the pleadings and 'the jurisdictional

allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.' " *Thompson v. Naval Academy Ass'n,* 2013 WL 3965100, *3 (D. Md. Aug. 1, 2013) (alterations in original) (*quoting Khoury v. Meserve*, 268 F.Supp.2d 600, 606 (D. Md. 2003) (citation omitted)).

### B.   Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

In order to survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  As the Fourth Circuit has explained, "To survive a motion to dismiss pursuant to Rule 12(b)(6), [Plaintiffs'] '[f]actual allegations must be enough to raise a right to relief above the speculative level,' thereby 'nudg[ing] [its] claims across the line from conceivable to plausible.'" *Vitol, S.A. v. Primerose Shipping Co.,* 708 F.3d 527, 543 (4th Cir. 2013), *quoting Twombly*, 550 U.S. at 555 and 570.  Along these same lines, in *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009), the Fourth Circuit explained further:

> To emphasize the Federal Rules' requirements for stating claims that are warranted and therefore form a plausible basis for relief, the Supreme Court has held that a complaint must contain 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' *Twombly*, 550 U.S. at 555.  To discount such unadorned conclusory allegations, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled 'to the assumption of truth.'" *Ashcroft v. Iqbal*, 556 U.S. 66, 679 (2009).  This approach recognizes that 'naked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.' *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).

*Id*.  As this Court has previously noted, "conclusory statements or a formulaic recitation of the elements of a cause of action will not suffice." *Pavlovic v. Univ. of Md. Balt. County*, 2013 U.S. Dist. LEXIS 125802, *4 (D. Md. Sept. 3, 2013) (internal quotations omitted).

If, on a Rule 12(b)(6) motion, "matters outside the pleadings are presented to and not

excluded by the court, the motion must be treated as one for summary judgment under Rule 56." *See* Fed. R. Civ. P. 12(d).

### C. <u>Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the maP098Ytters stated in the affidavit. Fed. R. Civ. P. 56(c)(4).

## IV.    ARGUMENT

In determining whether a plaintiff has stated a plausible claim under the Fair Labor Standards Act, a court looks to Fed. R. Civ. P. 8.  *Landers v. Quality Communs., Inc*., 2015 U.S. App. LEXIS 1290, *1 (9th Cir. Nev. Jan. 26, 2015).  Fed. R. Civ. P. 8(a)(2) requires that each claim in a pleading be supported by a short and plain statement of the claim showing that the pleader is entitled to relief.  Fed. R. Civ. P. 8(a)(2).   To satisfy Fed. R. Civ. P. 8(a)(2), a complaint must contain sufficient factual content to state a claim to relief that is plausible on its face.  A complaint that offers labels and conclusions, a formulaic recitation of the elements of a cause of action, or "naked assertion" devoid of further factual enhancement will not suffice.  *Id.*, at * 1.

To satisfy Fed. R. Civ. P. 8(a)(2), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim for relief is plausible on its face when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  This standard does not rise to the level of a probability requirement, but it demands more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.  *Id.*

Pre-*Twombly* and *Iqbal*, a complaint under the FLSA for minimum wages or overtime wages merely had to allege that the employer failed to pay the employee minimum wages or overtime wages.  However, post-*Twombly* and *Iqbal*, a court reviews a plaintiff's complaint to determine whether the allegations plausibly state a claim that the employer failed to pay minimum wages and overtime wages, keeping in mind that detailed facts are not required.  *Id*.

The Complaint in this matter is tellingly devoid of substance.  The Court should exercise

12

its gatekeeping function and dismiss generic claims in the Complaint that recite wage/hour violations that are merely possible, rather than plausible.

**A.**     **Suburban House Was Entitled to Take the Tip Credit; The Allegations That Defendants Failed To Inform Plaintiffs Of The FLSA's Tip Credit Provisions, Are Baseless.**

The First Amended Complaint alleges, in a conclusory fashion, that Defendants failed to inform Plaintiffs of the tip credit provisions of the FLSA; that Plaintiffs did not retain their tips, and therefore, Defendants were not able to utilize the tip credit against the Plaintiffs' minimum wage. *See* First Amended Compl., at ¶¶ 19(a), 22-23, 26A, 42. There is nothing specific that provides any context by which Plaintiffs are alleging they were not permitted to retain their tips.

It is a shame that bare allegations and stock complaints can be lodged against employers who are then forced to expend significant resources defending against them.  Suburban House's tipped employees were informed about the tip credit.  They were informed of the substantive provisions of § 203(m) verbally by Defendant Horowitz, and through posters around the restaurant that notified employees about the FLSA's tip credit provisions.  They were permitted to retain all tips, and Defendants were entitled to take the tip credit.

The FLSA requires covered employers to pay nonexempt employees a minimum wage for each hour worked, 29 U.S.C. § 206(a), but allows employers to pay less than the minimum wage to employees who receive tips. 29 U.S.C. § 203(m). "Tipped employees . . . are required to receive at least the minimum wage, but their employers are permitted to pay a direct wage of $2.13 per hour and then take a 'tip credit' to meet the $7.25 per hour minimum wage requirement." *Gionfriddo v. Jason Zink, LLC, 769 F. Supp 2d 880, 893 (D. Md. 2011)* (citing *29 U.S.C. § 203(m)*). "In other words, an employer satisfies the FLSA if he pays his tipped employees at least $2.13 per

13

hour, and that *wage*, in conjunction with the tips they receive, make up at least the $7.25 per hour minimum wage." *Id*.

Section 203(m) contains two further requirements.  The tip credit:

> shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subSection, and all tips received by such employee have been retained by the employee, except that this subSection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

*29 U.S.C. § 203(m).*[9]  Thus, "to utilize the tip credit, during the relevant time frame the employer was required to (1) inform the employee that the tip credit was being claimed; and (2) allow the employee to retain all tips he or she received…"  *Arencibia v. 2401 Rest. Corp.*, 831 F. Supp. 2d 164, 175 (D.D.C. 2011).

"Although an employer need not 'explain' the tip credit to an employee, Courts have widely interpreted section 203(m) to require at a minimum that an employer inform its employees of its intention to treat tips as satisfying part of the employer's minimum wage obligations."  *Bernal v. Vankar Enters., Inc.*, 579 F. Supp. 2d 804, 809 (W.D. Tex. 2008) (listing cases); see also *Kilgore v. Outback Steakhouse*, 160 F.3d 294, 299-300 (6th Cir. 1998) (explanation of tip credit not required).

Here, employees were permitted to retain all tips.  *Exh. 1* (Horowitz Decl.), at ¶ 7; *Exh. 3*

---

[9] Although the notice requirements of § 203(m) were enacted in 1974, the Department of Labor did not promulgate a final regulation implementing the statutory requirement until May 5, 2011. The new rule, codified at 29 C.F.R. § 531.59(b), includes a more detailed notice requirement than courts had previously mandated.  In relevant part, the new regulation states that "an employer is not eligible to take the tip credit unless it has informed its tipped employees in advance . . . that all tips received by the tipped employee must be retained by the employee . . .."   29 C.F.R. § 531.59(b).  Thus, under the new regulation, it is not sufficient that employers "allow the employee to retain all tips he or she received."  *Arencibia*, 831 F. Supp. 2d at 175.  Rather, employers must also inform employees of the requirement that they must be allowed to retain all of the tips.

14

(Bopst Decl.), at ¶ 3; *Exh. 4* (Tyson Decl.), at ¶ 1; *Exh. 5* (Morgan Decl.), at ¶ 1.

Furthermore, employees were informed of the tip credit.  Throughout the relevant time period, when a tipped employee was hired, Defendant Horowitz sat down with each new hire and explained that he or she will be paid $3.63/hour (or the corresponding relevant amount in past years), plus tips.  Horowitz explained that the employee will be able to earn and keep all tips which is why the rate is so low.  Horowitz did not use the phrase "tip credit" in this conversation, but he did explain that the reason why the hourly rate is so low is because the tips will make up for the low rate.  Horowitz explained this to all employees upon hire and did so to Danson, Peterson and Fitzgerald at their times of hire.  *Exh. 1* (Horowitz Decl.), at ¶ 7; *Exh. 5* (Morgan Decl.), at ¶ 2.

Additionally, Suburban House posts employment-related posters in and around the kitchen area.  For example, a Poster entitled "Maryland Minimum Wage and Overtime Law" has been posted for years on the loading dock door.  This Poster provides the Maryland Minimum Wage Rate in effect on different dates ($7.25 Until 12/31/14; $8.00 Effective 1/1/15; $8.25 Effective 7/1/15; $8.75 Effective 7/1/15; $8.75 Effective 7/1/16, etc.).  The Poster also states, in relevant part,

> **Tipped Employees** (earning more than $30 per month in tips): must earn the State Minimum Wage Rate per hour.  Employees must pay at least **$3.63** per hour.  This amount plus tips must equal at least the State Minimum Wage Rate.

(Emphasis in original).  *Exh. 1* (Horowitz Decl.), at ¶ 8; *Exh. 3* (Bopst Decl.) at ¶ 2; *Exh. 4* (Tyson Decl.), at ¶ 5; *Exh. 5* (Morgan Decl.), at ¶ 5.

Suburban House also has a Poster entitled "Federal Labor Laws" posted on the front kitchen door.  That Poster states, in relevant part:

> TIP CREDIT.  Employers of "tipped employees" who meet certain conditions may claim a partial wage credit based on tips received by their employees.  Employees

15

must pay tipped employees a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference.

*Exh. 1* (Horowitz Decl.), at ¶ 8; *Exh. 3* (Bopst Decl.) at ¶ 2; *Exh. 4* (Tyson Decl.), at ¶ 5; *Exh. 5* (Morgan Decl.), at ¶ 5.

Suburban House was entitled to take the tip credit because it had two (2) posters that explained all the salient aspects of § 203(m) and Defendant Horowitz had verbal conversations with new hires explaining that the reason why the hourly rate was so low is because the balance would be made up in tips, which employees keep. Thus, Suburban House adequately notified tipped employees of the tip credit provisions of the FLSA. *See e.g., Ide v. Neighborhood Rest. Partners, LLC*, 32 F.Supp.3d 1285, 1292-93 (N.D. Ga. 2014) (a prominently displayed poster using language approved by the Department of Labor to explain 29 U.S.C.S. § 203(m) is sufficient notice); *Pellon v. Bus. Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1310-11 (S.D. Fla. 2007) (finding sufficient notice where employees "were orally informed that their salary would be $2.15 (or more) plus tips" and two posters concerning the tip credit were prominently displayed in the workplace).

**B.**     **There is No Evidence to Support Plaintiffs' "Alternative" Allegations, Unrelated to the Tip Credit, That They Were Denied Minimum Wage and Overtime.**

> *1.    The minimum wage and overtime claims in the First Amended Complaint fail to meet the plausibility standards set forth in Iqbal and Twombly.*

The Initial Complaint did not even allege that Plaintiffs ever worked overtime at all. Defendants raised this omission as a basis for dismissal in its initial dispositive motion. *See* Doc. No. 18-1, pp. 12-13.

Now, in the First Amended Complaint, Plaintiffs have pled the minimum wage and overtime violation only in the most generic fashion, and not concretely enough to pass muster. The First Amended Complaint is devoid of any factual context whatsoever.  It simply pleads that "[e]ach of the Plaintiffs have suffered minimum wage and overtime violations, throughout their employment with the Defendants, as further outlined below….," and that each Plaintiff "…regularly worked over forty hours a week yet was not paid at the proper overtime rate required by the FLSA and the MWHL."  *See* First Amended Compl., at ¶¶10 (); 11-13.  There is nothing in the First Amended Complaint that provides the requisite facts supporting plausibility.  A generic statement that a plaintiff regularly worked over forty hours a week and was not paid, is not enough to survive a motion to dismiss.

The Fourth Circuit recently clarified that it requires an overtime plaintiff to provide in the Complaint some sort of factual context that will nudge the Complaint for "conceivable" to "plausible."  *Hall v. DIRECTV, LLC*, 846 F.3d 757, 777 (4th Cir. Md. 2017) (reviewing different circuits' approaches, and holding that "…plaintiffs seeking to overcome a motion to dismiss must do more than merely allege that they regularly worked in excess of forty hours per week without receiving overtime pay."); *citing Pruell, 678 F.3d at 13*; *Dejesus v. HF Mgmt. Servs., LLC, 726 F.3d 85, 90 (2d Cir. 2013)* (explaining that the "requirement that plaintiffs must allege overtime without compensation in a 'given' workweek [is] not an invitation to provide an all-purpose pleading template alleging overtime in 'some or all workweeks'").  Yet the First Amended Complaint does have a generic quality, because it contains no substantive allegations regarding the nature of the overtime and minimum wage claims.

The *Hall* court left open the exact form of factual context a plaintiff must plead, declining to require, for example, that a plaintiff provide the dates of a particular workweek in which she

worked over forty hours without proper payment.  It is, however, very clear that some sort of substantive factual information is required:

> At the same time, however, we emphasize that the standard we today adopt does not require plaintiffs to identify a *particular* week in which they worked uncompensated overtime hours.  Rather, this standard is intended "to require plaintiffs to provide some factual context that will 'nudge' their claim 'from conceivable to plausible.'" *Dejesus, 726 F.3d at 90* (*quoting Twombly, 550 U.S. at 570*).  Thus, to state a plausible FLSA overtime claim, plaintiffs "must provide sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week." *Nakahata v. N.Y.-Presbyterian Healthcare Sys., 723 F.3d 192, 201 (2d Cir. 2013)*.  A plaintiff may meet this initial standard "by estimating the length of her average workweek during the applicable period and the average rate at which she was paid, the amount of overtime wages she believes she is owed, *or any other facts* that will permit the court to find plausibility."  *Landers, 771 F.3d at 645* (emphasis added) (citation omitted).

> *Hall v. DIRECTV, LLC*, 846 F.3d at 776 (emphasis in original).

Here, the First Amended Complaint contains no facts that would permit the Court to find plausibility – no detail about the length and frequency of Plaintiffs' unpaid work; no estimates of the length of an average workweek, the average rate at which they were paid, the amount of overtime they believe they are owed, or any other fact that would support a reasonable inference that they worked in excess of forty hours and were denied overtime.  In stark contrast, the *Hall* court reversed the lower court's dismissal of the complaint because that complaint described in some detail the plaintiffs' regular work schedules, rates of pay, and uncompensated work time; each plaintiff provided an approximation of his general workweek, with each Plaintiff alleging that he typically worked in excess (and in some cases well in excess) of forty hours per week; plaintiffs alleged that under DIRECTV's piece rate compensation system, they consistently performed significant work for which they received inadequate compensation, and as a result, taking into account their total compensation and the number of hours they worked, their final pay did not

reflect compensation for all hours worked and they were not properly compensated for overtime. *Id*., at 776-77.  The First Amended Complaint lacks sufficient factual content from which the Court could draw the reasonable inference that Defendants have engaged in the misconduct alleged, and it should therefore be dismissed. *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.

2.     *Plaintiffs did not customarily and regularly work overtime.*

A review of the Plaintiffs' payroll records reflects that none of them worked over forty (40) hours per week, at all, in the three (3) year period prior to the filing of the Initial Complaint (November 6, 2013 – November 6, 2016).  *Exh. 1* (Horowitz Decl.), *Exh. 1* (Payroll Records); *Exh. 2* (Accountant's Report), at p. 3 (Schedule).

The absence of any overtime hours for the Plaintiffs over the last three (3) years is consistent with other workers' affidavit testimony that servers do not typically work overtime.  *See Exh. 3* (Bopst Decl.), at ¶ 3; *Exh. 4* (Tyson Decl.), at ¶ 2; *Exh. 5* (Morgan Decl.), at ¶ 3; *see also Exh. 1* (Horowitz Decl.), at ¶ 5.

The reason why the First Amended Complaint (and Initial Complaint) are so lacking in specificity is because the plaintiffs did not work any overtime.

3.     *Plaintiffs' earnings met, and typically exceeded, the minimum wage and overtime thresholds.*

A review of Plaintiffs' payroll journals (attached to *Exh. 1* (Horowitz Decl.), as *Exh. 1* (Payroll Records) shows that Plaintiffs' earnings met, and typically exceeded, the required thresholds.

The payroll journals show that, after the initial training period, each Plaintiff earned $3.63/hour (the "RATE" column).  The next column is "HOURS."  The "EARNINGS" column is the RATE times the HOURS.  The "REIMB & OTHER PAYMENTS" columns reflects the tips.

*Id.*

The useful summary in the Accountant's Report (*Exh. 2*) shows, for each check for each Plaintiff, what was actually earned ("Total Earnings" column), and what was required pursuant to the minimum wage in effect at the time ("Required Minimum Wage" column). The "Variance" column shows the difference between what was earned and what was required under the applicable minimum wage in effect at the time.

Out of the seventeen (17) checks Danson received from November 6, 2013 through November 6, 2016, her earnings met the minimum wage on one (1) occasion, and exceeded the minimum wage on sixteen (16) occasions, sometimes far exceeding the minimum wage by up to 228% (*see e.g.*, Danson check dated 4/17/15). There were no occasions on which Danson's earnings fell below the minimum wage. *Exh. 2*, at p. 3.

Out of the seventeen (17) checks Fitzgerald received from November 6, 2013 through November 6, 2016, her earnings met the minimum wage on two (2) occasions, and exceeded the minimum wage on fifteen (15) occasions, sometimes by as much as 163% (*see e.g.*, Fitzgerald check dated 7/31/15). There were no occasions on which Fitzgerald's earnings fell below the minimum wage. *Exh. 2*, at p. 3.

Out of the eighteen (18) checks Peterson received from November 6, 2013 through November 6, 2016, his earnings met the minimum wage on one occasion, fell below the minimum wage on one (1) occasion,[10] and exceeded the minimum wage on fifteen (15) occasions, sometimes by as much as 263% (*see e.g.*, Peterson check dated 4/24/15). *Exh. 2*, at p. 3.

---

[10] The day Suburban House learned of this error, it wrote a check to Peterson for $30.32 and promptly mailed it to him at his home address. *Exh. 1* (Horowitz Decl.), at *Exh. 4* (Copy of Peterson check for $30.32).

**C.      There Is No Merit To Any Claim For Unlawful Wage Deductions Based On Business Losses.**

Besides Suburban House's policy regarding customer walkouts (which was not enforced and which was never imposed on the Plaintiffs), Defendants did not require employees to pay for "business losses." *See Exh. 3* (Bopst Decl.), at ¶ 4; *Exh. 1* (Horowitz Decl.), at ¶ 11; *Exh. 4* (Tyson Decl.), at ¶ 3; *Exh. 5* (Morgan Decl.), at ¶ 4.

In reality, neither Danson, Peterson nor Fitzgerald had their wages deducted for a customer walkout. *See Exh. 3* (Bopst Decl.), at ¶ 4. To the extent any Counts of the First Amended Complaint are based on Defendants' former policy concerning customer walkouts, these claims should be dismissed because the Complaint has not alleged, and cannot allege, that these alleged policies were actually imposed upon the named Plaintiffs such that their wages were actually deducted for "walkouts." *See* First Amended Complaint. *See e.g., Avery v. Chariots for Hire*, 748 F. Supp. 2d 492, 502 (D. Md. 2010) (plaintiffs failed to state a claim under the FLSA or the MWHL for unpaid wages due to deductions made from their paychecks because they did not allege any facts that the defendants actually deducted wages from their paychecks for damage to the defendants' vehicles). or other "business losses."

Suburban House no longer maintains this policy, and in any event, this policy was "all bark and no bite." Suburban House only enforced its customer walkout policy approximately one (1) time in the last three (3) years. *Exh. 3* (Bopst Decl.), at ¶ 4; *Exh. 1* (Horowitz Decl.), at ¶ 11,

**D.      Records Reflect That Danson Received Her Final Wages.**

The issue of an employee's final wages is covered by MD. LAB. & EMPL. CODE ANN. § 3-505 and properly couched as an individual claim, rather than a putative collective action.

In any event, Plaintiff's First Amended Complaint alleges that Danson's last day of work

21

was May 10, 2015.  First Amended Compl., at ¶ 11.  Defendants' records reflect that Danson was paid by check dated 5/15/15 for the prior week's work. *Exh. 1* (Horowitz Decl.), *Exh. 1* (Payroll Records), p. 4.  There is no evidence that Defendants failed to pay Danson's final wages.

**E.**      **Danson And Peterson Are Not "Employees" Under The FLSA.**

Class actions are expressly provided for under the Fair Labor Standards Act, 29 U.S.C.S. §§ 201 *et seq.* (the "Act"), although they are governed by 29 U.S.C.S. § 216(b) rather than by Fed. R. Civ. P. 23.  The difference is that under § 216(b) the class member must opt in to be bound, while under Rule 23 the class member must opt out in order not to be bound.  Nevertheless, a class representative must have a cause of action in his own right in order to bring a class action.  *See e.g.*, *Vanskike v. Peters*, 974 F.2d 806, 806 (7th Cir. Ill. 1992).

Here, the Danson and Peterson worked at Suburban House while they were prisoners.  *Exh. 1*, at ¶¶ 6-7.  The FLSA applies only to workers who are "employees" within the meaning of the Act.  *See* 29 U.S. Sec. 206(a).   It is well-established that the FLSA does not apply to prison inmates, who are not "employees" under the FLSA.  *See Harker v. State Use Industries*, 990 F.2d 131, 133-36 (4th Cir. 1993); *see also Sanders v. Hayden*, 544 F.3d 812, 814 (7th Cir. 2008) (listing cases); *see also, Bennett v. Frank*, 395 F.3d 409 (7th Cir. 2005); *Loving v. Johnson*, 455 F.3d 562 (5th Cir. 2006) (per curiam); *Tourscher v. McCullough*, 184 F.3d 236, 243-44 (3d Cir. 1999); *Villarreal v. Woodham*, 113 F.3d 202, 206-07 (11th Cir. 1997); *Danneskjold v. Hausrath*, 82 F.3d 37, 42 (2d Cir. 1996); *McMaster v. Minnesota*, 30 F.3d 976, 980 (8th Cir. 1994); *Henthorn v. Dep't. of Navy*, 29 F.3d 682, 686-87 (D.C. Cir. 1994).

In particular, courts have recognized that the employment of incarcerated persons "is not representative of the typical private sector employer/employee relationship," and that while such

22

work programs have "valid rehabilitative aspects to [them], the labors of ... inmates are of a penological nature." *Watson v. Rios*, 2007 U.S. Dist. LEXIS 70299, 2007 WL 2792179 at *4 (E.D. Ky. Sept. 21, 2007).   Therefore, inmates who perform labor under the auspices of institutional work programs cannot be likened to persons in the private sector who choose to participate in the work force. *George v. Badger State Industries*, 827 F. Supp. 584 (W.D. Wisc. 1993).   As a result, courts have held that federal labor regulations have no applicability to incarcerated workers. *See, e.g., Harker,* 990 F.2d at 135 (collecting cases and declining to apply the economic reality test); *Vanskike*, 974 F.2d at 809-10 (declining to extend minimum wage protections to prisoners working within institutions).   Because labor performed in an institution or for a separate entity under the auspices of a correctional department is performed as part of a sentence of incarceration, it does not fall within the ambit of the FLSA.   *Reimonenq v. Foti*, 72 F.3d 472, 476-77 (5th Cir. 1996) ("At its root, the work release program exists for the benefit of the prisoner himself.   The purpose of the program is to prepare inmates upon release from prison to function as responsible, self-sufficient members of society.").

In *Harker*, the Fourth Circuit held that inmates working in a state-run prison industry program were not covered by the FLSA.   *See Harker*, 990 F.2d at 133-36.   The Court found that labor performed in prison labor programs "differs substantially from the traditional employment paradigm covered by the [FLSA]."   *Id*.   The Court noted that inmates have not made the "'bargained-for exchange of labor'" for mutual economic gain which occurs in a true employer-employee relationship.   *Id*.

Indeed, the difference between inmate workers such as Plaintiff Peterson and Plaintiff Danson compared to traditional employees, is significant.   Inmates such as Peterson and Danson must return to the prison when their shift is complete.   *Exh. 6* (Pokorny Decl.), at ¶ 2.   They are

23

not permitted to drive themselves to work.  *Id.*, at ¶ 6.  They are required to turn over their paycheck to the Department of Corrections, from which Program fees are deducted.  *Id.*, at ¶ 6.  The Department of Corrections remains involved with the inmate and the employer for the duration of the inmate's labor.  *Id.*, at ¶ 6.  They are subject to random drug tests.  *Id.*, at ¶ 6.  Inmate laborers such as Plaintiffs Peterson and Danson are prohibited from making or receiving telephone calls; having visits with friends or relatives; making unauthorized purchases; leaving the job site even for lunch; and conducting personal business.  *Exh. 6* (Pokorny Decl.), at ¶ 5.  They may not remove cash tips from the restaurant.  *Exh. 1* (Horowitz Decl.), at ¶ 4.

Additionally, Courts have held that incarcerated individuals such as Plaintiffs Peterson and Danson are not covered by the FLSA because "the statute itself states that Congress passed minimum wage standards in order to maintain a 'standard of living necessary for health, efficiency, and general well-being of workers.'"  *Harker*, 990 F.2d at 133.  As the Court noted, "inmates have no such needs because the [prison] provides them with the food, shelter, and clothing that employees would have to purchase in a true employment situation."  *Id.*  Thus, inmates do not require a minimum wage to ensure their welfare and standard of living.  *Id.*

The Seventh Circuit rejected an inmate FLSA claim under the same reasoning.  Writing for a unanimous Seventh Circuit panel, for example, Judge Richard Posner has strongly denounced arguments that prisoners should be protected by the wage and hour provisions of the FLSA:

> [P]eople are not imprisoned for the purpose of enabling them to earn a living.  The prison pays for their keep.  If it puts them to work, it is to offset some of the cost of keeping them, or to keep them out of mischief, or to ease their transition to the world outside, or to equip them with skills and habits that will make them less likely to return to crime outside.  None of these goals is compatible with federal regulation of their wages and hours.  The reason the FLSA contains no express exception for prisoners is probably that the idea was too outlandish to occur to anyone when the legislation was under consideration by Congress.

*Bennett*, 395 F.3d at 410; *see also Sanders*, 544 F.3d 812.

Plaintiffs Peterson and Danson are not covered by the FLSA and the Complaint should be dismissed.

**F.      Danson And Peterson Are Unsuitable Class Representatives Based On Their Inmate Status.**

Putting aside the issue of whether the FLSA covers Danson and Peterson, the fact that they worked for Suburban House as prison inmates renders them unsuitable class representatives. Persons are "similarly situated" when they "raise a similar legal issue as to coverage, exemption, or nonpayment o[f] minimum wages or overtime arising from . . . similar . . . job requirements and pay provisions." *Montoya v. S.C.C.P. Painting Contractors, Inc.*, No. CCB-07-455, 2008 U.S. Dist. LEXIS 16354, 2008 WL 554114, at *2 (D. Md. Feb. 26, 2008) (*quoting DeLuna-Guerrero v. N.C. Growers' Ass'n, Inc.*, 338 F. Supp. 2d 649, 654 (E.D.N.C. 2004)).    Danson's and Peterson's status as prison inmates raises unique legal issues regarding the terms and conditions of their employment, compared to traditional tipped employees – they were not even allowed to take their cash tips out of the restaurant.  Thus, they are not similarly situated.  Moreover, they would not be able to show adequacy of representation, commonality or typicality for the same reasons, and therefore the class allegations should be stricken with respect to Danson and Peterson pursuant to Rules 23 (c)(1)(A) and 23(d)(1)(D) of the Federal Rules of Civil Procedure.

**IV.    CONCLUSION**

The Court should dismiss the First Amended Complaint, or in the alternative, grant summary judgment in favor of Defendants.  Suburban House was entitled to take a tip credit against the minimum wage because it informed employees of the tip credit and permitted tipped

employees to retain their tips.  Plaintiffs' wage records show that Defendants' paid Plaintiffs in accordance with the minimum wage and overtime requirements of the FLSA and Maryland state law.  There is nothing to support any individual or class-wide allegations of failure to pay Danson's final wages or improperly deducting Plaintiffs' pay for customer walkouts.

Allowing this matter to proceed further invites a fishing expedition to explore threadbare allegations of purported wage and hour violations, with no support.  Employers should not be burdened by frivolous fishing expeditions conducted by plaintiffs at employers' expense. *Bouthner v. Cleveland Constr., Inc.*, 2012 U.S. Dist. LEXIS 28497 (D. Md. Mar. 5, 2012) (Messitte, J.) (*quoting D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995)).  The FLSA was not intended to enable plaintiffs to rummage around an employer's records based on generic, template complaints, searching for wage and hour violations at the employer's tremendous expense.

Plaintiffs have been aggressively recruiting putative class members, filing opt-in notices (some of which are frivolous, as they are filed by employees who worked outside the statutory period, or on behalf of non-tipped employees), and providing quotes to the media – actions which are undeserved because they concern unsupported claims.  Plaintiffs' actions have endangered the business of Defendants without justification.  Defendants find themselves in the unfortunate position of having to expend scarce resources defending against claims that are entirely unsubstantiated.   Plaintiffs are expected to continue to attempt to amend the complaint further, alleging inestimable numbers of wage and hour violations, in an attempt to have something "stick" and deplete Defendants' resources along the way.

WHEREFORE, Defendants respectfully requests that this Honorable Court dismiss the Complaint or, in the alternative, enter summary judgment in Defendants' favor and against the

26

Plaintiffs Nicholas Peterson, Jena Danson and Cali Fitzgerald on behalf of themselves and others similarly situated.

Respectfully submitted,

_____ / s / _____

Melanie L. Glickson, Esq.
Federal Bar No. 28484
GLICKSON LAW FIRM, LLC
6 Reservoir Circle, Suite 201
Pikesville, Maryland 21208
Tel. 443.550.1298
Fax: 443.638.0080
*Attorney for Defendants*

27